# Heisler, Appellant, *v.* Thomas Colliery Co. et al.

*Equity—Pleadings—Bill—Answer—Averments of bill—Res adjudicata—Evidence—Stare decisis—Statutes—Constitutional law.*

1. When a case is heard upon the pleadings, the averments of the bill will be accepted as true only in so far as they are not challenged by the answer, all the averments of which must be so regarded, if they have any bearing on the controversy.

2. When res adjudicata is applicable, every essential fact, proved or unproved, as well as the ultimate fact found, must be treated as established, when pertinent for consideration in later proceedings between the same parties.

3. Stare decisis simply declares that, for the sake of certainty, a conclusion reached in one case should be followed in later proceedings if the facts are substantially the same, even though the parties may be different.

4. Similarity of the relevant facts being necessary in order that stare decisis may apply, it follows that if they are essentially different in a later case from those established in an earlier one, this principle is inapplicable, particularly where the decision depends not on the effect of some of the facts, but on the combined force of all that are proved.

5. Since the Constitution is the supreme law of the land, a prior opinion upon a similar statute is entitled to great but not conclusive weight, in determining whether or not a later statute is constitutional.

*Constitutional law—Taxation—Uniformity—Classification—Anthracite and bituminous coal—Local and special legislation—Interstate commerce—Equal protection of the laws—Public policy—Act of May 11, 1921, P. L. 479.*

6. Under article IX, section 1, of the Constitution, requiring that "all taxes shall be uniform upon the same class of subjects within the territorial limits of the authorities levying the tax," the courts cannot hold a taxing statute unconstitutional unless it appears the classification violates the Constitution clearly, palpably, plainly and in such manner as to leave no doubt or hesitation in the minds of the judges.

7. The rules applicable to special and local legislation under article III, section 7, should not be applied in determining whether the classification of a taxing statute is proper under article IX, section 1. Under the former, imperative necessity for the classifi-

cation must appear; under the latter, the classification must be sustained unless it is certain there is no reasonable basis for it.

8. Classification for purposes of taxation as a general rule is a matter for the legislature; it is the uniformity of taxation according to the classification made which is for the courts.

9. Neither similarity of name, chemical constituents nor use, conclusively determines that two commodities may not be separately classified for purposes of taxation.

10. Classification for the purpose of taxation may be based on the existence of differences recognized in the business world, on the want of adaptability of the subjects to the same method of taxation, upon the impracticability of applying to them the same methods so as to produce justice and reasonably uniform results, or upon well grounded considerations of public policy.

11. The state is without power to impose a tax upon articles which are shipped to interstate or foreign commerce.

12. The Act of May 11, 1921, P. L. 479, does not violate either article III, section 7, or article IX, section 1, of the Constitution of the State, or the commerce or equal protection of the law's clauses of the Constitution of the United States.

Mr. Chief Justice MOSCHZISKER and Mr. Justice KEPHART dissented.

Argued April 17, 1922.  Appeal, No. 15, May T., 1922, by plaintiff, from decree of C. P. Dauphin Co., No. 709, Equity Docket, dismissing bill in equity, in case of Roland C. Heisler v. Thomas Colliery Company, E. Herbert Suender, Superintendent, John Gilbert et al., Directors of Thomas Colliery Co., Samuel S. Lewis, Auditor General of the Commonwealth, and Charles A. Snyder, State Treasurer.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.  Affirmed.

Bill in equity for injunction to restrain assessment of tax and enforcement of Act of May 11, 1921, P. L. 479. Before HARGEST, P. J., WICKERSHAM and FOX, JJ.

The opinion of the Supreme Court states the facts.
Bill dismissed.  Plaintiff appealed.

*Error assigned,* inter alia, was decree, quoting it.

*Henry S. Drinker, Jr.,* with him *Reese H. Harris* and *Frank W. Wheaton,* for appellants.—The court below refused to recognize that it was bound under the decisions of this court in Com. v. Coal Co., 251 Pa. 134, and Com. v. Coal Co., 251 Pa. 159—to hold the Act of 1921 unconstitutional, but "distinguished" these cases on the ground that in them counsel for the Commonwealth neglected to put on record the facts which in the case at bar form the proper basis of a different classification, for tax purposes, of anthracite and bituminous coal.

The vital feature of this case consists not in the unimportant characteristics in which anthracite and bituminous differ, but in the fact that with regard to the one essential characteristic on which the Alden decision was based, they are admittedly the same.

The question is res adjudicata: D. C. Bearn v. Safe Dep, etc., Co., 233 U. S. 24; McDowell v. Oyer, 21 Pa. 417.

The doctrine of stare decisis is not confined to cases involving so-called "rules of property."

It is well settled in Pennsylvania that the doctrine of stare decisis applies to and controls constitutional questions, so long as the original cases are not formally overruled: Kilpatrick v. Com., 31 Pa. 198; Com. v. Nat. Oil Co., 157 Pa. 516; Application of the Judges, 64 Pa. 33.

A distinction between two industries which would justify a different law regulating their conduct does not necessarily justify different laws in connection with their taxation. The test is that laid down in the leading case of Ayars's App., 122 Pa. 266, 281.

The Act of May 11, 1921, is in violation of article III, section 7, of the Pennsylvania Constitution prohibiting local and special legislation regulating the affairs of counties and also in violation of the Fourteenth Amendment to the federal Constitution.

The Act of May 11, 1921, is in violation of the commerce clause of the federal Constitution.

*George E. Alter,* Attorney General, with him *George Ross Hull, Emerson Collins,* Deputy Attorneys General, and *Robert S. Gawthrop,* First Deputy Attorney General, for appellees.—When the Alden Case is considered in connection with the findings upon which it was based it fails to support the position of appellant: Com. v. St. Clair Coal Co., 251 Pa. 159.

The separate classification of anthracite and bituminous coal for tax purposes is clearly sustained by considerations of public policy.

Anthracite and bituminous coal are universally recognized and commercially and otherwise treated as different commodities.

The doctrine stare decisis does not apply: Shurtz v. Thomas, 8 Pa. 359.

The law bearing on the classification for tax purposes, is shown by the following cases: Kitty Roup's Case, 81* Pa. 211; Germania Life Ins. Co. v. Com., 85 Pa. 513; Banger's App., 109 Pa. 79; Fox's App., 112 Pa. 337; Com. v. Canal Co., 123 Pa. 594; Com. v. Brewing Co., 145 Pa. 83; Com. v. Oil Co., 157 Pa. 516; Pittsburgh v. Coyle & Co., 165 Pa. 61; Knisely v. Cotterel, 196 Pa. 614; Com. v. Clark, 195 Pa. 634; Com. v. Trust Co., 227 Pa. 163; Com. v. R. R., 244 Pa. 241; Provident Life & Trust Co. v. McCaughn, 245 Pa. 370; Altoona v. O'Leary, 254 Pa. 25..

The tax on anthracite coal is not a tax on exports or a regulation of interstate commerce: Coe v. Errol, 116 U. S. 517; Diamond Match Co. v. Ontonagon, 188 U. S. 32; Bacon v. Illinois, 227 U. S. 504; General Oil Co. v. Crain, 209 U. S. 211.

The Act of 1921 is not in contravention of the Fourteenth Amendment of the Constitution of the United States; Bell's Gap v. Penna., 134 U. S. 232; Com. v. Bell's Gap R. R., 23 W. N. C. 224; Jennings v. Coal Ridge Imp. Co., 147 U. S. 147, affirming 127 Pa. 397; Magon v. Illinois Trust & Savings Bank, 170 U. S. 283; St. Louis Southwestern Ry. Co. v. Arkansas, 235 U. S. 350.

OPINION BY MR. JUSTICE SIMPSON, June 24, 1922 :

Plaintiff appeals from a decree of the court below dismissing his bill in equity to have the Act of May 11, 1921, P. L. 479, "imposing a state tax on anthracite coal," declared unconstitutional. The case was heard upon the pleadings, without evidence being produced; hence, while only those averments of the bill which are unchallenged by the answer, are to be accepted as true, all the averments of the latter must be so regarded, if they have any bearing on the controversy.

At the threshold of the argument, we are met with the allegation that stare decisis controls; the basis of this claim is that,—at the time we decided, in Com. v. Alden Coal Co., 251 Pa. 134, and Com. v. St. Clair Coal Co., 251 Pa. 159, that the cognate Act of June 27, 1913, P. L. 639, violated article IX, section 1, of the Constitution of the State,—all the facts existed which are now relied on to sustain the Act of 1921, though many of them were not proved, admitted or found in the trial of those cases. This contention indicates a misconception of legal principles, in that it attempts to apply the rules growing out of a former adjudication between the same parties, to those appertaining to a prior judgment between different parties. When res adjudicata is applicable, every essential fact, proved or unproved, as well as the ultimate fact found, must be treated as established, when pertinent for consideration in a later suit between the same parties; whereas stare decisis simply declares that, for the sake of certainty, a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different. Similarity of the relevant facts being necessary, it follows that if here they are essentially different from those in the Alden Coal Co. and St. Clair Coal Co. cases, supra (as the court below found they were), its ruling that stare decisis did not apply was necessarily correct. Indeed this is particularly so, where, as here, the decision depends not on

the effect of some of the facts, but upon the combined force of all that are proved at the time the question arises, when the progress of science or the course of trade may, since the prior decision, have greatly changed the uses to which one or both of the commodities may be put.

Moreover, stare decisis has no real place in constitutional law when the validity of another statute is under consideration. The reasons which actuated our predecessors in declaring an act unconstitutional, have and should have great weight with us, when determining whether or not a later similar statute is likewise objectionable, but if, after having fully considered the matter, we are nevertheless impelled to the conclusion that the later enactment is constitutional, we cannot decide otherwise, unless we are to forget our duty to support the Constitution as the supreme law. Our reason for this conclusion cannot be better expressed than by interpolating a few appropriate words into the wonderfully simple and convincing language of Chief Justice MARSHALL, when considering whether or not the courts have the power to declare a statute unconstitutional: "If both the law [i. e. the statute backed by the court's prior error, if it was such] and the Constitution apply to a case, so that the court must either decide that case conformably to the law [i. e. the erroneous decision declaring it to be so], disregarding the Constitution, or conformably to the Constitution, disregarding the law, the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty": Marbury v. Madison, 1 Cranch 137, 178. To this it may be added (though somewhat aside from the present inquiry) that it is at least as important now as it ever was, that doubts as to the constitutionality of a statute (though arising from a prior decision) should always be resolved in favor of constitutionality.

On the main question,—is the Act of 1921 constitutional?—we first observe that article IX, section 1, of the Constitution, relied upon to defeat the statute, in

fact concedes the right of the legislature to classify the subjects of taxation. It says: "All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." In form this is restrictive, but it none the less recognizes that the power which had theretofore existed in the general assembly to legislate upon all subjects not forbidden by the Constitution, still exists so far as relates to taxation, limited only by the provision as to uniformity. Despite appellant's argument, it is clear that an entirely different situation exists when the question arises under article III, section 7, for there no power to classify is conceded, indeed, impliedly at least, it is denied; hence legislation, based on classification regarding the subjects there specified in it, can be sustained only where there is "a necessity springing from manifest peculiarities clearly distinguishing those of one class from each of the other classes, and imperatively demanding legislation for each class, separately, that would be useless and detrimental to the others" (Ayars's App., 122 Pa. 266, 281; Com. v. Schumaker, 255 Pa. 67, 70), a statement wholly inappropriate when speaking of cases arising under article IX, section 1. In respect to these it has been well said: "In short, the Constitution having delegated to the legislature the power to classify persons and property for purposes of taxation it may select any reasonable basis upon which to make the classification, and may create as many classes as it may in its discretion decide upon, subject always to the limitation that it must exercise good faith and must not make arbitrary and unjust distinctions": White on the Constitution of Penna., 379-380. It follows that if anthracite coal can, from any reasonable standpoint, form a class in and of itself, the legislative power to so tax it is uncontrollable by the courts. Probably this conclusion would not be challenged by any one; but it is attempted to fritter it away by arguments now to be considered.

With a wealth of reiteration, we are told "coal is coal, and all must be taxed or none may be taxed"; to which we may answer "land is land," "ice is ice," and "gas is gas," but no one doubts the legislative power to differently tax seated and unseated land, natural ice and artificial ice, and natural gas and manufactured gas. The error in this oft-repeated claim arises from overlooking the fact that names are but a human device for designating things, the thing, not the name for it, being the important matter; hence the mere designation of both bituminous and anthracite as coal, cannot alone operate to prevent the legislature from classifying them for the purpose of taxation. Surely no argument is needed to sustain this conclusion, but it may be asked, if anthracite coal, bitumose coal, cannel coal and charcoal must always be in the same taxable class, because "coal is coal," could they be taxed separately if the word coal was omitted from their names and they were called anthracite, bituminous, cannelite and chardwood?

We are told also, and the point is strongly presented, that the chemical constituents of anthracite and bituminous coal are much alike, as are also some of the processes of nature which brought each of them into existence; but neither one nor both of these facts conclude the question under review. Pursuing to its logical conclusion the line of inquiry thus suggested, we find that the ascending grade from wood to lignite, cannel coal, bituminous coal, anthracite, and, finally, to graphite or diamonds, is only the further carrying on of the same chemical reactions, resulting principally in the formation and expulsion of more and more of the hydro-carbons and other gases; lignite being wood with some of them expelled, anthracite coal being wood with most of them gone, and graphite and diamonds being wood with practically all of them eliminated. So, also, coke is anthracite coal in all essential respects; in the former man has expelled these gases by the artificial application of heat; in the latter nature has eliminated them by

heat, largely generated through pressure, during the great cataclysms which resulted in a reasonably stable world.    Despite these similarities, probably all would agree that diamonds can be taxed although anthracite coal is not, as can the latter although wood and coke are not; and this was the principle stated in Com. v. Delaware Division Canal Co., 123 Pa. 594, 621: "Nor is classification necessarily based upon any essential differences in the nature or, indeed, the condition of the various subjects; it may be based as well upon the want of adaptability to the same methods of taxation, or upon the impracticability of applying to the various subjects the same methods, so as to produce just and reasonably uniform results, or it may be based upon well-grounded considerations of public policy."

Recognizing this in part, appellant admitted, at the bar of this court, that, since only bituminous coal can practically be used for the manufacture of coke, so much thereof as was in fact used for that purpose could be separately taxed; but claimed that if anthracite is to be taxed it must be in conjunction with so much of the bituminous coal as is used for like purposes.    He also says: "Mere competition between two wholly different articles, could not, of itself, bring them within the same 'class of subjects.'"    Taken together, these two statements amount to this: the legislature may classify, however alike the articles may be, if they do not come into competition; it may classify, though they come into competition, provided they are not alike; but if they are alike and also come into competition, it may not classify; that is, a "class of subjects," in the constitutional sense, is one in which the articles are not only alike but are competitive.    If this contention was sustained then natural ice and artificial ice would have to be taxed similarly or left untaxed, natural gas and manufactured gas would have to be treated in the same way, and doubtless many other subjects of taxation would be unnecessarily yoked together.    Reasonably applied, the rule

stated might furnish an easy method to guide the general assembly, but the courts cannot found their decisions upon it alone, since the Constitution does not so provide, but, on the contrary, gives to the legislature the right to determine the principles upon which the classification shall be made, and to the courts the right to interfere only when the course pursued results, not in classification but merely in arbitrary separation.

Moreover, as applied to the matter under consideration, any attempt to thus divide bituminous coal into two classes would result in disaster.  The tax could not be levied at the mines, unless there was also a provision for refunding in case the coal was not afterwards used in the manufacture of coke; and even this would be ineffective to sustain the tax, so far as relates to that great part of the coal which is shipped in interstate or foreign commerce; for, as soon as it starts on its journey, it is beyond the taxing power of the State: Phila. & Reading Ry. Co. v. Hancock, 253 U. S. 284; McNeill v. Director General of Railroads, 272 Pa. 525.  Relying upon, but apparently misapprehending this legal principle, appellants argued in the court below that the Act of 1921 was unconstitutional, because a large part of the anthracite coal would be shipped ultimately in interstate or foreign commerce, though the tax was imposed before the journey was even begun; a contention not made orally and but briefly referred to in appellant's paper-book here, possibly because of Crescent Cotton Oil Co. v. State of Mississippi, decided by the Supreme Court of the United States on November 14, 1921.

Moreover the contention upon this point, practically considered, asks us to reverse the legislature on a disputable question of fact, viz: Has the new use to which bituminous coal may now be put, carried it into a separately taxable class?  When anthracite coal was first ascertained to be available for domestic and manufacturing purposes, it found wood in practical possession of the field.  For some time the former entered but slightly

in competition with the latter; now, in this State at
least, the former is but little used for those purposes.
When then, under this contention, did the competition
become sufficiently great to allow classification as be-
tween wood and coal used for domestic purposes? and
what tribunal was to decide this, the legislature or the
courts? Admittedly bituminous coal is used in the man-
ufacture of coke, and anthracite coal, practically con-
sidered, cannot be; and admittedly also the smaller sizes
of anthracite coal come in competition with bituminous
coal in the manufacture of steam for industrial uses, and
to a minor degree for heating purposes. Can the courts
rightfully say that the time has not yet come when,
despite the former and because of the latter, the legisla-
ture may not classify under the general power given to
it? Or can they rightfully say to it, you may not exercise
the power to classify until a greater percentage of bitu-
minous coal is used in the manufacture of coke than the
percentage of anthracite coal used in the manufacture
of steam, and if they may do this, where must they draw
the line in order not to encroach on legislative power?

It is perhaps not possible for us to so answer these
questions as to cover all cases which may arise, nor is it
necessary that we should. In Com. v. Delaware Division
Canal Co., 123 Pa. 594, 623, we said: "Classification for
purposes of taxation, as a general rule, is a matter for
the legislature; it is the uniformity of taxation, accord-
ing to that classification, which is for the courts." In
Sharpless v. Phila., 21 Pa. 147, 164; and in Speer v.
School Board, etc., of Blairsville, 50 Pa. 158, we said:
"We can declare an act of assembly void, only when it
violates the Constitution clearly, palpably, plainly, and
in such manner as to leave no doubt or hesitation in our
minds." So also in Pennsylvania R. R. Co. v. Ewing, 241
Pa. 581, 589, and in Mahon v. Pennsylvania Coal Co.,
274 Pa. 489, we quoted with approval the follow-
ing language from Chicago, Burlington & Quincy R. R.
Co. v. McGuire, 219 U. S. 549: "The scope of judicial in-

quiry in deciding the question of power is not to be confused with the scope of legislative considerations in dealing with the matter of policy. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and an earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance."

· If we permitted ourselves to declare that the legislature could only form classes for the purposes of taxation, by putting into each class all things which in their use were not substantially competitive, we would not only seriously impair its constitutional right to classify, but would probably also eliminate many of the objects of taxation. For instance, would the fact of their general use for clothing, prevent silk and velvet being taxed without adding also cotton goods and ginghams, or broadcloth without also taxing palm beach suitings? If they did, the silk, velvet and broadcloth would doubtless escape because of serious objections against taxing the cheaper materials. Illustrations such as the foregoing could probably be indefinitely multiplied, such as bricks and stones used for building, slate and shingles used for roofing, mahogany and pine used for furniture, plated ware and solid silver used on the tables, etc., etc.

In the light of these considerations we can only hold, as already stated, that, so far as concerns the classes into which articles may be arranged for purposes of taxation, the matter is one for the legislature and not for the courts; and the latter not only have no duty to classify but they are and should be forbidden to interfere with the legislative classification unless they can say with certainty that it is purely illusory, clearly intended as an evasion of the Constitution. It is not so in the present case; on the contrary we have findings of undisputed facts, showing a wide difference in the character

of these coals and the use to which they are put; that the people, through the separate branches of their government, state and national, have long treated them as different articles, to be separately classified, needing the protection of government in different ways and to different degrees; and hence the legislature has the power to classify them for the purpose of taxation, to the appropriate end that where governmental care is most required the burdens of government shall bear heaviest. These undisputed findings may be summarized as follows:

"Anthracite coal differs from bituminous coal in the following physical properties: The amount of fixed carbon, the amount of volatile matter, color, lustre and structural character. The percentage of fixed carbon in anthracite coal is much higher, and the percentage of volatile matter is much lower than in bituminius coal. Anthracite coal is hard, compact and comparatively clean and free from dust and is commonly termed 'hard coal,' while bituminous coal is very much less hard, and is dusty and dirty and is commonly termed 'soft coal' [hence] bituminous coal burns with more or less smoke while anthracite coal burns with practically no smoke.

"The fuel ratio......of bituminous coal differs from that of anthracite coal; as the fuel ratio of bituminous coal rises the coal is more soft, as the fuel ratio of anthracite coal rises the coal is more hard.

"Sixty-one per cent of anthracite coal produced in Pennsylvania is used for domestic purposes and substantially all anthracite coal is used for fuel in the production of heat for domestic purposes and of steam for domestic purposes and for power; but bituminous coal is used not only for fuel but as a raw material from which a great number and variety of commercial products are manufactured.

"A small percentage of anthracite produced in Pennsylvania is used in the production of gases, known as water-gases and producer-gas. Said gases, which are

also produced from coke, are of a different character from that produced from bituminous coal [the latter] known as coal gas, is produced from the volatile matter in said coal; [in addition] a large amount of bituminous coal produced in Pennsylvania is used in the production of gas for fuel and illumination in addition to the gas produced in connection with the manufacture of coke.

"Methods of eliminating impurities from bituminous coal are being developed, whereby the percentage of the Pennsylvania bituminous coal available for the manufacture of marketable coke is increasing. Recent experiments in by-product ovens indicate that practically all the bituminous coal in Pennsylvania will be available for the manufacture of marketable coke when the elimination of high sulphur and high phosphorus has been accomplished.

"The gas liberated in the manufacture of coke by the by-product process is saved and used for fuel and illumination and, with some resultant chemical changes and by distillation and condensation, volatile matter is recovered in the form of tar or pitch, ammonia (used largely in the manufacture of fertilizers), cyanide and benzol, and other oils used to generate power by internal combustion and for other purposes."

Much of the tar and pitch so recovered is used in surfacing highways, but from a large part thereof there are extracted, by various processes, fourteen or more separate articles of commerce and hundreds of medicinal and other products in common use, which, though it is possible to "extract them from anthracite, cannot be produced therefrom in quantities rendering such production commercially practicable and none are, in practice, produced therefrom."

For more than sixty years congress has taxed anthracite and bituminous coal differently, as has the Canadian parliament for upwards of thirty-five years; and the general assembly of this State has repeatedly legislated for the two classes separately, as well regarding the regu-

lation of mining as the weights at which the coals may be sold (see Acts May 18, 1878, P. L. 67; June 2, 1891, P. L. 176; June 26, 1895, P. L. 334; June 9, 1911, P. L. 755; May 27, 1921, P. L. 1198); as a result of these and other factors relating to market value, "the price of anthracite coal on cars at the mine is ordinarily much larger than the price of bituminous coal on cars at the mine, the difference resulting largely from difference in rates of royalty and cost of production and preparation for market."

It is, of course, true, as pointed out in Com. v. Alden Coal Co., 251 Pa. 134, 141-2, that a difference in price would not alone justify a separate classification; but when it appears that the price varies because of the causes above pointed out, and that the life histories of the two kinds of coal are essentially different, during some of the time before and much of the time after man seeks to reduce them to possession, surely the courts could not properly say that their separate classification "violates the Constitution clearly, palpably, plainly and in such manner as to leave no doubt or hesitation in our minds."

Indeed it is difficult, if not impossible, to understand how we can rightfully assert the legislature is powerless to classify these two coals for the purpose of taxation, and yet approve, as we have done (Mahon v. Pennsylvania Coal Co., 274 Pa. 489, a classification of the two industries for the purpose of enforcing a great public policy applicable to one but not to the other, and providing penalties and a means for enforcing that policy. This fact alone would seem to show that such great differences exist in relation to the subject as to prevent the courts from saying, as a matter of law, that the two commodities are in all respects alike. The only answer attempted is thus set forth in Com. v. Alden Coal Co., supra: "In determining whether legislative classification is special and discriminatory, regard must be had to the purpose for which the legislation is de-

signed. Differences which make classification for some purposes proper, may furnish no reasonable basis for classification for other purposes; it is their relation to the end proposed by the particular legislation that determines whether the classification is warranted." This language,—applicable to the inferred right to classify the subjects specified in article III, section 7, rather than to the admitted power under article IX, section 1, was said, moreover, before the passage of the Act of May 27, 1921, P. L. 1198, and our decision sustaining the legislative classification there made,—wholly overlooks the fact that the power to classify, under article IX, section 1, is not limited to cases where the commodities are unlike or are not competitive, but, on the contrary, may be based on other grounds, and the courts cannot justly interfere with it, where, as here, "the classification is not an arbitrary one, but one which actually exists in the business world": Com. v. Lehigh Valley R. R. Co., 244 Pa. 241, 246.

It is further alleged the act violates article III, section 7, of the Constitution in that it is local and special legislation; we agree with appellant that this point is "covered by the foregoing argument on uniformity of taxation," and hence it need not be repeated.

It is claimed also that the act violates the commerce clause of the federal Constitution; a sufficient answer to which is the opinion of the Supreme Court of the United States in Crescent Cotton Oil Co. v. State of Mississippi, already referred to.

It is finally contended that the statute does not give to appellant the "equal protection of the laws" guaranteed to him by the 14th Amendment to the Constitution of the United States; a complete answer to which is the following quotation from District of Columbia v. Brooke, 214 U. S. 138, 150: "We have repeatedly decided,—so often that a citation of the cases is unnecessary,—that it does not take from the states the power of classification, and also that such classification

need not be either logically appropriate or scientifically accurate. The problems which are met in the government of human beings are different from those involved in the examination of the objects of the physical world and assigning to them their proper associates. A wide range of discretion, therefore, is necessary in legislation to make it practical, and we have often said that the courts cannot be made a refuge from ill-advised, unjust or oppressive laws."

The decree of the court below is affirmed and the appeal is dismissed at the cost of appellant.

DISSENTING OPINION BY MR. CHIEF JUSTICE MOSCH-ZISKER:

That the great Commonwealth of Pennsylvania should levy the tribute, on those within and without her borders, which indirectly will result from the taxing act now before us, is, in my opinion, a matter for regret; but, disregarding this, I dissent from the view of the majority, sustaining the legislation, solely on the ground that, while some important differences between the present statute and the one previously declared unconstitutional (Com. v. Alden Coal Co., 251 Pa. 134) may be suggested, yet, on the controlling point upon which we rested our former decision, the two acts are in practical accord. When the other case was here, I reached the deliberate conclusion, stated by Mr. Justice STEWART for the court (p. 142), that, if coal were to be taxed, there could be no valid classification between anthracite and bituminous; nothing has been brought forward since to change that conclusion. The fact that, for numerous other purposes, such as operating the mines, etc., classification between the two sorts of coal has been permitted, is beside the question: men and women may be classified separately for many legislative purposes, but when it comes to taxing them, differentiation is undoubtedly forbidden; so with coal. To my mind, the several kinds of coal can no more be separated for purposes of taxation than can the

different kinds of grain; the State may tax grain, but, surely, it cannot legally tax wheat and exempt barley.

In addition, notwithstanding my respect for the view of the writer of the majority opinion, I cannot agree with his statement that "stare decisis has no real place in constitutional law"; this thought, being unnecessary to the decision in hand, ought to be taken as dictum of that writer. The doctrine in question, while not always deemed controlling (and perhaps not so in the instant case), cannot be put aside as a principle of law when considering fundamental points; my idea of the limitations on it in that field are expressed in Luzerne County v. Morgan, 263 Pa. 458, 465, but, despite such limitations, that stare decisis has long been recognized as occupying a "real place" in American constitutional jurisprudence, is shown by many decisions in all jurisdictions.

Again, I think the words which the writer of the majority opinion "interpolates" into the quotation from Marbury v. Madison, are not "appropriate." As I understand the governing principle, when a prior decision is overruled,—although, to avoid injustice, certain rights and positions, assumed on the faith thereof, may remain undisturbed—the theory is that such decision, being in error, never was law; not that it was the law and that the court changes it: Ray v. Natural Gas Co., 138 Pa. 576, 590; Harlow v. Beaver Falls Boro., 188 Pa. 263, 265-66. The latter theory would make courts creators, rather than interpreters, of the law, a position they never were intended to occupy.

I believe the Act of 1921 to be unconstitutional, and would so declare it; hence this dissent.

DISSENTING OPINION BY MR. JUSTICE KEPHART:

It is because of the importance of this case that I record my dissent. This court, in Com. v. St. Clair Coal Co., 251 Pa. 159, passed on the same questions now involved, and declared the act then before us to be unconstitutional; I feel bound by that decision for the follow-

ing reasons: It is my opinion the court, as it was at that time composed, had before it all the facts now urged to sustain the present bill; and, if it did not have them, they were easily obtainable, for the uses of the different coals enumerated as controlling in the instant majority opinion had then been in actual existence in this country for some time.  The court there considered the matters above referred to as thoroughly as we are now considering them.  Like any other case, "all relevant facts and issues directly connected with the subject-matter of the litigation......might properly have been offered in the prior case" (State Hospital for Criminal Insane v. Consolidated Water Supply Co., 267 Pa. 29, 37) ; and all issues entering into the governing point are there determined: Allen v. Int. Text Book Co., 201 Pa. 579, 582. The reasons given to sustain the conclusion of the court in the former case are not so erroneous or out of harmony with the Constitution that we can declare they were error.  I cannot discover additional ground on which to rest contrary view.

For the reasons given, I would apply the law of the former case and hold the present act unconstitutional.