Monongahela Street Railway Co. *v.* Philadelphia Company et al., Appellants.

Argued September 29, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

*Elder W. Marshall,* with him *W. A. Seifert, Frank W. Ittel, Reed, Smith, Shaw & McClay, Philip A. Fleger* and *Henry G. Wasson, Jr.,* for appellants.

*Wm. S. Moorhead* and *Earl F. Reed,* with them *A. W. Henderson, Judson A. Crane, Roy G. Bostwick, Thorp, Bostwick, Reed & Armstrong* and *Moorhead & Knox,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, November 27, 1944:

This case comes before us on appeals of the Philadelphia[1] Company and the Consolidated[1] Traction Company from a final decree of the court below ordering the former company to perform certain covenants and to pay all taxes, charges, licenses and assessments now or hereafter lawfully imposed upon Monongahela or for which it is chargeable on account of its corporate existence, its franchises, property, real or personal, cars, business, earnings, bonds, capital stock, dividends or profits, including United States Income and Profits taxes, Pennsylvania Corporate Income, Capital Stock, and Corporate Loans taxes and municipal real estate taxes, and also ordering the Philadelphia Company to specifically perform and carry out its covenants and agreements to pay the interest accrued and payable and hereafter to accrue and become payable on the Refunding Bonds of Monongahela, and that Philadelphia immediately pay to the bearer or bearers of the Refunding Bonds the sum of $104,350, being the installment of interest thereon which became due and payable June 1, 1943, and pay in addition any installment of interest thereon which became due and payable since the filing of the supplemental bill in this proceeding.

On and prior to January 1, 1902, Monongahela owned and operated a railway system in the City of Pittsburgh and other municipalities in Allegheny County. On February 8, 1902, but as of January 1, 1902, Monongahela

---

[1] In this opinion the Philadelphia Company is referred to as "Philadelphia"; Monongahela Street Railway Company as "Monongahela"; Consolidated Traction Company as "Consolidated"; Pittsburgh Railways Company as "Pittsburgh Railways".

leased its entire railway system to Consolidated. Philadelphia guaranteed to Monongahela the prompt payment of the rental agreed to be paid and the faithful performance of the covenants agreed to be performed by Consolidated. The Special Act under which Philadelphia was incorporated gave it power to guarantee the performance of obligations of other corporations. The lease and guaranty were duly recorded. Since January 1, 1902, the only income of Monongahela consisted of that derived under the terms of the lease and a supplemental agreement thereto relating to the issuance of Refunding Bonds, hereinafter referred to. After the lease, Monongahela did not own any property not covered by the lease.

In consideration of the lease, Consolidated covenanted to pay as rental specified installments of money and to assume and pay all taxes then or thereafter lawfully imposed on Monongahela or for which Monongahela would otherwise be liable or chargeable on account of its franchises, property, earnings, dividends, or profits, it being the stated intention that the installments of rental should be a net rental available for dividends to stockholders of Monongahela. Monongahela was required to make all such reports and returns of its property, earnings, dividends, and profits for the purposes of taxation as Consolidated should require. Consolidated covenanted to pay and meet interest on bonds of Monongahela and its merged companies and interest on bonds issued for the purpose of taking up said bonds when they matured. Consolidated also covenanted, at its own expense, to do paving and repairing, defend suits against Monongahela during the lease, and pay verdicts and judgments thereon and other claims; at its own expense to keep up insurance; and at its own expense to operate the properties.

The lease and guaranty have been ever since their execution in full force and effect, except as modified by a supplemental agreement referring to the issuance of Refunding Bonds. Monongahela has duly performed and

discharged all of the covenants and liabilities made by or resting on it under the original agreement of lease and the agreement supplemental thereto. During the entire term of the lease, Monongahela has made all reports and returns of taxes, including Federal and State income taxes, required of it, said returns and reports having been prepared and filed by the person who was Controller of both Pittsburgh Railways and Philadelphia.

At the time of the execution of its guaranty, Philadelphia owned over 93% of the preferred stock and over 72% of the common stock of Consolidated and, from time to time thereafter, acquired additional amounts of the said stock and now owns all of the common stock and over 97% of the preferred stock of Consolidated. Ever since the execution of the lease from Monongahela to Consolidated, the demised properties have been operated by Pittsburgh Railways (except during its receivership and reorganization proceedings) under an operating agreement between Consolidated and Pittsburgh Railways, the term of which was for five years from January 1, 1902, and thereafter until terminated on three months' notice by either party. All of the taxes imposed upon Monongahela, including Federal and State income taxes, continuously from 1902 until in or about the year 1938, were paid by Pittsburgh Railways except for a few years when they were paid by its Equity Receivers. Pittsburgh Railways paid such taxes in performance and discharge of the covenants of Consolidated under the said lease. Philadelphia caused Pittsburgh Railways to make these tax payments.

In 1938, Federal and State taxes became delinquent and later, in 1940, real estate taxes became delinquent. Neither Consolidated nor Philadelphia informed Monongahela of the non-payment of its taxes. Until November 20, 1942, Philadelphia never denied liability for the payment of Monongahela's taxes. In the Federal and State tax returns prepared by or under the direction of the Controller of the Accounting Department of Philadel-

phia and subsidiary companies, the address of Monon-gahela was given as 435 Sixth Avenue, being the offices of Philadelphia and subsidiary companies. All notices and demands for payment of taxes were mailed to that address. They were never sent direct to Monongahela or transmitted to it by the recipient thereof until the latter part of 1942. The principal place of business of Monongahela is at 514 Smithfield Street, Pittsburgh, Pennsylvania.

On May 22, 1942, Monongahela wrote a letter to Philadelphia stating that it had, only recently, received information that a large amount of Federal, State, and local taxes imposed on Monongahela had not been paid for a number of years. It expressed surprise at this information and formally demanded that Philadelphia inform Monongahela of the taxes and the amounts thereof which had not been paid and demanded that Philadelphia promptly pay and discharge such unpaid taxes. A copy of that letter was sent to Consolidated. Five weeks later, Philadelphia replied to this letter, but did not give the requested information and suggested that the disposition of the taxes be held in abeyance. On or about September 28, 1942, Monongahela received from the Trustees of Pittsburgh Railways a copy of a second notice and demand for income taxes made by the collector, dated August 15, 1942. The notice was directed to Monongahela at 435 Sixth Avenue, being the address of Philadelphia and subsidiaries. On October 9, 1942, Monongahela informed Philadelphia of its receipt of the notice from the collector and inquired what Philadelphia proposed to do concerning the payment of the taxes previously mentioned in Monongahela's letter of May 22, 1942. Three weeks later, Philadelphia replied to this letter, again requesting time and stating that it would reply to Monongahela's inquiry in a few weeks. On October 30, Monongahela received a letter from the attorneys for the Trustees of Pittsburgh Railways enclosing notices of levies and distraints from the Col-

lector of Internal Revenue. On November 2, 1942, Monongahela informed Philadelphia of the levies and distraints and urgently requested that Philadelphia advise Monongahela what Philadelphia proposed to do about carrying out its guaranty of the payment of Monongahela taxes. Until Philadelphia's reply to this letter on November 20, 1942, it had never denied its liability as guarantor for the payment of Monongahela's taxes.

Consolidated never denied its liability for the payment of Monongahela's taxes until it filed its answer to the bill, on March 20, 1943. In his letter of November 20, 1942, to Monongahela's counsel, the general attorney for Philadelphia and subsidiaries stated that he had advised Philadelphia that it was under no obligation under its guaranty to pay Federal Income taxes of Monongahela, because Consolidated was under no obligation to pay those taxes; and stated that Philadelphia was unable to give Monongahela the unequivocal assurance which it had requested that Philadelphia would pay such taxes. The general attorney stated, however, that Philadelphia, as guarantor of the lease, gave its assurance that it would pay Pennsylvania capital stock and local real estate taxes owing by Monongahela.

Monongahela then prepared and filed a Bill of Complaint against Philadelphia for specific performance of its guaranty of the faithful performance of the covenant by Consolidated in the Agreement of Lease to pay all taxes imposed upon Monongahela or for which it was otherwise liable on account of its property, earnings, and profits. Consolidated was joined as a defendant, being a party to the Agreement of Lease.

To the Bill of Complaint, Consolidated filed an answer on the merits, wherein it denied its liability for income taxes imposed upon Monongahela. While it admitted the receipt of Monongahela's letter of May 22, 1942, in which the tax covenant of Consolidated in the lease was set forth and in which the demand was made

for the payment of all Monongahela's taxes, including income taxes, Consolidated never answered that letter or denied its liability for any such taxes.

Philadelphia filed preliminary objections, alleging that the Bill failed to disclose that Monongahela and Consolidated had submitted to unnamed arbitrators differences which had arisen between them as to the construction of Consolidated's tax covenant in the lease. *Theretofore* no such differences between Consolidated and Monongahela, the parties to the arbitration covenants, had arisen.

The preliminary objections came before President Judge ROWAND and Judges RICHARDSON and SMITH. The objections were overruled. Philadelphia then filed its answer on the merits, denying liability under its guaranty for the payment of anything other than the installments of rent which Consolidated covenanted to pay.

In the meantime, Philadelphia declined to pay the installment of interest which became payable June 1, 1943, and for the first time denied its liability to pay such interest.

Refunding Bonds and a Refunding Mortgage had been issued by Monongahela at the request of Consolidated and Philadelphia, in which Monongahela agreed, inter alia, to pay interest on the Refunding Bonds and to pay all lawful taxes, charges, and assessments assessed against the mortgaged property, including all taxes on the franchises, earnings, and business of Monongahela. As an inducement to Monongahela to issue said Refunding Bonds, Consolidated entered into a supplemental agreement with Monongahela, in which Consolidated covenanted, inter alia, that it would promptly and faithfully do, perform, and pay all things, acts, and moneys which Monongahela had agreed to do, perform, or pay in the Refunding Bonds or the Refunding Mortgage. This included the payment of interest on those Bonds and taxes on Monongahela's earnings. The only

payment excluded was the payment of the principal of said Bonds when due.

Philadelphia guaranteed to Monongahela the faithful performance of the covenants agreed to be performed by Consolidated in the supplemental agreement referred to. Interest had been paid on the Refunding Bonds by Philadelphia, as guarantor of the supplemental agreement, from December 1, 1932, to December 1, 1942.

By reason of the default in the payment of interest on the Refunding Bonds, Monongahela was required to file a supplemental bill for the specific performance by Philadelphia of the covenants of Consolidated in the supplemental agreement. To this supplemental bill, Philadelphia filed an answer on the merits. The case was put at issue on the pleadings and was tried by Judge W. HEBER DITHRICH. After the trial, Requests for Findings of Fact and Conclusions of Law were filed by Monongahela, Philadelphia, and Consolidated, respectively, and the case was argued before the Chancellor on November 8, 1943. On December 23, 1943, the Chancellor filed his Adjudication, containing Findings of Fact, Discussion, Conclusions of Law, and Decree Nisi. The Chancellor found and concluded that Consolidated had covenanted faithfully and punctually to pay all taxes now or hereafter lawfully imposed upon Monongahela or for which Monongahela was otherwise liable or chargeable on account of its franchises, property, earnings or profits, including United States Income and Profits taxes, Pennsylvania Income, Capital Stock, and Corporate Loans taxes, and municipal real estate taxes, it being the intention that the installments of rental Consolidated covenanted to pay should be a net rental available for dividends to stockholders of Monongahela.

The Chancellor found that the guaranty of Philadelphia to Monongahela of the faithful performance of the covenants agreed to be performed by Consolidated in the Agreement of Lease included the covenant of Consolidated to assume the payment of and faithfully and

punctually pay all taxes imposed upon Monongahela or for which it was liable on account of its earnings and profits and included the assumption and payment of United States Income and Profits taxes, Pennsylvania Corporate Income, Capital Stock, and Corporate Loans taxes and real estate taxes now or hereafter imposed upon or assessed against Monongahela.

The Chancellor found and concluded that Philadelphia had guaranteed to Monongahela the faithful performance of the covenants of Consolidated in the supplemental agreement promptly to pay interest on the Refunding Bonds of Monongahela. In the Decree Nisi, the Chancellor adjudged and decreed that Philadelphia specifically perform and carry out its guaranty of the faithful performance of the covenants of Consolidated faithfully and punctually to pay the taxes and promptly and faithfully to pay the bond interest.

Philadelphia filed 127 Exceptions to rulings on evidence, Findings of Fact, Conclusions of Law, and Decree Nisi of the Chancellor and to the refusal or failure of the Chancellor to make Findings of Fact and Conclusions of Law as requested by Philadelphia. Consolidated filed 24 Exceptions which were identical with 24 of the 127 Exceptions of Philadelphia. Monongahela filed three Exceptions to the Findings of Fact for the purpose of correcting slight inaccuracies or clerical errors.

The Exceptions came on for argument before Judges DITHRICH, MARSHALL, and ELLENBOGEN. On March 17, 1944, the Court, in an opinion by Judge DITHRICH, disposed of all of the Exceptions and entered a final decree in the form of the Decree Nisi. The Court sustained the three Exceptions of Monongahela, the 11th Exception of Consolidated, and the 12th Exception of Philadelphia relating to inadvertent inaccuracies or typographical errors.

The Court sustained Philadelphia's Exception 85 to refusal of its Request 24 that there was no evidence that Philadelphia paid any taxes of Monongahela at any time,

with the qualification that the tax payments made by Pittsburgh Railways, a wholly owned Subsidiary of Philadelphia, were caused to be made by Philadelphia, and sustained Philadelphia's 86th Exception to refusal of its Request 25 that there was no evidence that Consolidated paid any taxes of Monongahela at any time, with the qualification that the payments made by Pittsburgh Railways were in discharge of the covenants of Consolidated in performance of the Operating Agreement between Consolidated and Pittsburgh Railways.

The Court sustained Philadelphia's Exception No. 93 to the refusal of its requested conclusion of law 33 to the effect that the amendment of the Operating Agreement between Consolidated and Pittsburgh Railways, so as to include United States Income Taxes, did not obligate Pittsburgh Railways to pay the same unless Consolidated was obligated to pay them; the Court saying that the requested conclusion was so obvious that the Cancellor had deemed it unnecessary to state it.

The Court also sustained Philadelphia's Exception 103 to the effect that the claim filed by Philadelphia in the Pittsburgh Railways Reorganization Proceedings, asserting liability of Philadelphia, for taxes imposed upon Monongahela, including Federal income taxes, did not estop Philadelphia from taking a different position in this proceeding. The Court dismissed all the other Exceptions to Findings of Fact or Conclusions of Law and the failure to make findings and conclusions as requested and the Exceptions to the Decree Nisi.

On May 5, 1944, Philadelphia and Consolidated filed their appeals to this Court.

Appellants' first and chief proposition is that "the tax covenant of Consolidated in the lease does not cover Federal or State income taxes of Monongahela." Appellants argue that taxes of such categories were not "within the contemplation of the parties to the agreement and guaranty." While Philadelphia in its answer of July 16, 1943, denied its liability for the payment of

*any* taxes imposed upon Monongahela, Consolidated in its answer of March 20, 1943, denied its liability, under the lease and Philadelphia's liability under its guaranty, only for Federal and State income and profit taxes.

The Court's ninth Finding of Fact quotes from the first paragraph of the Second section of the lease of February 8, 1902, in which Consolidated assumes the payment of "all taxes . . . imposed upon Monongahela . . . on account of its . . . business earnings . . . or profits" and the court emphasized the provision in that paragraph that "the intention" was that "the rental provided for in the first section hereof shall be a net rental available for dividends to the stockholders of Monongahela." The third conclusion of the court below is that the covenant above quoted includes the assumption and payment of United States income and excess profits taxes, Pennsylvania Corporate Income, Capital Stock, and Corporate Loans taxes and Allegheny County real estate taxes and road and school taxes, now or hereafter imposed upon or assessed against Monongahela.

The Court adds in its fourth conclusion that "it was the intention of Consolidated and Monongahela, as is apparent from the wording of the Agreement of Lease, that all taxes imposed upon Monongahela would be paid by Consolidated, in order that the rental provided in the First Section thereof should be a net rental available for dividends to the stockholders of Monongahela."

We find that the obligation to pay Monongahela's income and other taxes is clearly imposed on Consolidated. As the Court below says: "The covenant is clear and unambiguous, and so all inclusive as to include income taxes, although they were not in existence when the covenant was made." Though there was no Federal income tax at that time, income taxes were well known [2] in this country and elsewhere, and were being agitated [2]

---

[2] The Federal income tax imposed by the Wilson-Gorman Tariff Act on August 28, 1894, was declared unconstitutional by the United

for in the United States, and Consolidated and Philadelphia could easily have stipulated in the covenant that the taxes whose payment was assumed and guaranteed did *not* include any income taxes which might thereafter be imposed by Federal or State laws.

We agree with the court below that this case is ruled by our decision in *Philadelphia City Pass. Ry. Co. et al. v. Philadelphia Rapid Transit Company*, 263 Pa. 561, 107 A. 329, where we affirmed the lower court on its opinion that the covenant of the lessee to "pay all taxes, charges and assessments now or hereafter lawfully imposed upon Ridge Avenue [the plaintiff] or for which Ridge Avenue would otherwise in anywise be liable or chargeable on account of its . . . earnings . . . or profits," required the lessee to pay the Federal Income taxes imposed by the Revenue Act of 1916. As Judge DITHRICH pointed out in his adjudication in this case: "A comparison of the material provisions of the tax covenant in the lease from Ridge Avenue to Philadelphia Rapid Trans. Co., and the lease from Monongahela to Consolidated, shows that they are virtually identical,

---

States Supreme Court on May 20, 1895, in a 5 to 4 decision (*Pollock v. Farmers' Loan & Trust Company*, 157 U.S. 429, 158 U.S. 601). "Violent criticism followed this event (the result of which was the adoption of the Sixteenth Amendment in 1913)": Warren's "The Supreme Court in U. S. History," Vol. 3, p. 422. The platform of the Democratic party in 1896 demanded that "Congress use all the constitutional power which remains after that decision, or which may come from its reversal by the Court as it may hereafter be constituted, so that the burden of taxation may be equally and impartially laid . . ."

Since the formation of the Union, income taxes have been in force for varying periods in at least 20 states. The Federal government had a war income tax during the period of 1861-1872. From 1863 to 1873 about 20% of all internal revenue was derived from taxes on incomes. In 1865, 28.3% of all the revenue was raised in this way. An income tax was established as a part of the fiscal system of England by Gladstone in 1853. See Encyclopedia Americana, Vol. 14, pp. 742-3-4. A tax on "profits" arising from "trades, occupations and professions (excepting ministers and schoolmasters)" was provided for in Pennsylvania by the Act of March 27, 1782, 2 Dallas Digest 8.

except that the covenant of Consolidated contains the added provision that it is 'the intention that the rental . . . shall be a net rental available for dividends to the stockholders of Monongahela.' "

In *North Pennsylvania Railroad Co. v. Philadelphia & Reading Ry. Co.*, 249 Pa. 326, 95 A. 100, the lessee by its covenants assumed, inter alia, the payment of all taxes and assessments for which the lessor should be liable upon the *yearly payments* to be made to the lessor by the lessee. This tax covenant was held to include an income tax imposed upon the lessor based on the yearly payments. The tax covenant in the Monongahela Lease is even broader than the tax covenant in the North Pennsylvania case; because the former includes all taxes imposed upon Monongahela or for which it would be liable on account of its earnings or profits.

In the language of Justice WILLIAMS in *Commonwealth v. National Oil Co., Ltd.*, 157 Pa. 516, 522: "To the ingenious and learned argument" of appellants' counsel in support of his position, "we reply 'stare decisis'." [3] The doctrine of stare decisis is recognized and applied by the courts of this Commonwealth. In *Smith v. Glen Alden Coal Co. et al.*, 347 Pa. 290, 302, 32 A. 2d 227, we said: "A rule of property long acquiesced in should not be overthrown except for compelling reasons of public policy or the imperative demands of justice." The doctrine of stare decisis is not confined to cases involving "rules of property." See *Kilpatrick v. Common-*

---

[3] In the following cases the lessee's tax covenant was interpreted as including the lessor's Federal income tax, the opinion citing and following the *Philadelphia Passenger Railway* case, supra: *In re Central of Georgia Ry. Co.*, 47 F. Supp. 786 (D.C.S.D. Ga. 1942); *Terminal Investment Co. v. Pope Estate Co.*, 122 Calif. App. 281, 10 P. (2d) 139 (1932); *Kimball v. Maddison*, 286 Mass. 277, 190 N.E. 506 (1934); *Farmers Loan & Trust Co. v. Park & Tilford*, 127 N.Y. Misc. 59, 215 N.Y.S. 244 (1925). See also *Pittsfield, etc., R. R. v. Boston & Albany R. R.*, 260 Mass. 390, 157 N.E. 611 (1927). See also *Hoboken Mfrs. R. Co. v. Hoboken R. R. Warehouse, etc., Co.*, 133 N.J. Eq. 270, 31 A. (2d) 801 (1943).

*wealth,* 31 Pa. 198, 210, and *Commonwealth v. National Oil Co., Ltd.,* supra, "Stare decisis simply declares that, for the sake of certainty, a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different": *Heisler v. Thomas Colliery Co.,* 274 Pa. 448, 452, 118 A. 394.

As to the guaranty of Philadelphia with respect to the covenant to pay taxes: Philadelphia being a compensated surety [4] any doubt as to the meaning of its guaranty is to be resolved against it. See *Hess et al. v. Merion Title & Tr. Co. of Ardmore,* 317 Pa. 501, 505, 177 A. 53. The negativing of Philadelphia's contention cannot be more succinctly expressed than it was by Judge DITHRICH in his adjudication: "We have the clearly expressed intention of the parties to the lease that the rental shall be a net rental available for dividends to stockholders of Monongahela. Manifestly, that intention could be carried out only by the lessee paying the taxes assessed against the lessor and the interest on its bonds. And when Philadelphia guaranteed the payment of the rental in the lease it, of course, must be deemed to have guaranteed the net rental.

"Sureties are as much bound by the true intent and meaning of the instrument to which they are parties, as principals are": *Roth v. Miller,* 15 S. & R. 100, 107; *Commonwealth ex rel. v. National Surety Co. et al.,* 310 Pa. 108, 114, 164 A. 788.

"Furthermore, Philadelphia is likewise bound by the declaration in the lease that the time for making each and every payment by the lessee 'shall be regarded as of the essence of the contract, and shall not be relieved against under any circumstances or in any manner whatsoever.' In other words, they are to be considered as prime covenants."

Counsel for Philadelphia attempted to distinguish the instant case from the Philadelphia City Passenger

---

[4] See the third sentence of the second paragraph of this opinion.

Ry. case by pointing out (using the language of Judge FERGUSON in his opinion in the City Passenger Ry. case) that since the plaintiff in that case "turned over all its property to the defendant, the only earnings or profits it can receive are from the lease and whether the tax be imposed upon income, net or gross, it is in fact imposed upon the rental." Counsel then say: "In the case at bar there is absolutely no proof that Monongahela when it executed the lease did not have property other than that demised to Consolidated, from which it might receive income in addition to the income derived from the lease." We think the answer to this contention is that the Court en banc in overruling exceptions to the Chancellor's refusal of Philadelphia's request to find that there was no evidence that . . . Monongahela did not have property in addition to that covered by the lease and did not have other income, found "that *Philadelphia,* in its claim filed in the reorganization proceedings of Pittsburgh, *stated that Monongahela had leased 'all of its properties' to Consolidated.* That statement, coupled with the fact that Monongahela was to be paid and was paid throughout the years the sum of $300.00 annually for the purpose of maintaining its corporate existence, would be sufficient to support an inference that it had no other property or income, even if we were to disregard the testimony of the witnesses called by plaintiff to prove the fact."

The conclusion reached by the court below is strengthened by the fact that the court's interpretation of the covenant in question is the interpretation the bound parties themselves have given it for more than a score of years. It has been frequently reiterated that unless contrary to the plain meaning of the contract, an interpretation given by the parties themselves will be favored: *Baker's Trust Est.,* 333 Pa. 273, 276, 3 A. 2d 785; *Armstrong v. Standard Ice Co.,* 129 Pa. Superior Ct. 207, 213; *Philadelphia v. Philadelphia Transportation Co.,* 345 Pa. 244, 251, 26 A. 2d 909. Williston on Con-

tracts, Revised Ed., Vol. 3, Sec. 623, p. 1792, makes the following statement: "The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court, and to this end not only the acts but the declarations of the parties may be considered. But if the meaning of the contract is plain, the acts of the parties cannot prove an interpretation contrary to the plain meaning. Such conduct of the parties, however, may be evidence of a subsequent modification of their contract."

Appellants contend that the tax covenant in the lease should be construed in the light of the antecedent Mellon Agreement of October 14, 1901 (and later amended) between the Philadelphia Company and A. W. Mellon, which it is alleged "paved the way" for the lease now being construed. In that Agreement the language by which the proposed lessee agreed to assume the payment of taxes was not nearly as comprehensive as the lease entered into later between Monongahela and Consolidated and made no reference to the assumption of liability for the payment of taxes on earnings or profits.

The court questioned the admissibility of the Mellon Agreement because it was not between the parties who executed the so-called Monongahela lease (i.e., the lease now before us) but the Agreement was admitted "subject to be stricken out" if the "proof does not come up to the offer." The only proof presented was found in a stipulation of counsel to the effect that A. W. Mellon did not own more than 26% of the stock of any of the companies who were parties to the Monongahela lease. Monongahela was not organized until December 23, 1901, which was subsequent to the Mellon Agreement. The four companies which were merged to form Monongahela were not parties to the Mellon Agreement. Mr. Mellon's agreement was to *procure* the several lessor corporations to execute leases to Philadelphia's nominees. Mr. Mellon did not purport to act as an agent for Monongahela or any of its constituent companies with

respect to the Monongahela leases, nor did he purport to act as agent for any of the other three companies whose properties Philadelphia agreed to procure one or the other of its subsidiaries to lease.

The Court below made the following conclusions of law on this phase of this case and these conclusions are accepted by this court:

"FOURTEENTH. There is no ambiguity in the terms of the tax covenant of Consolidated set forth in the Second Section of the agreement of lease requiring or authorizing resort to prior negotiations for its interpretation.

"FIFTEENTH. Negotiations prior to the execution of the agreement of lease, in so far as they are contrary to the terms of said agreement of lease, are to be considered as merged in the said agreement of lease as executed."

Appellants also contend that the decision of arbitrators, provided for in Paragraph Twelfth of the lease, was a condition precedent to the right of Monongahela to proceed in equity against Philadelphia. The provision for arbitration is found in Paragraph 12 of the lease from Monongahela to Consolidated. It provides as follows:

"It is expressly understood and agreed that if any breach of any of the covenants in this agreement contained on the part of either party hereto be alleged by the other, or if any difference shall arise at any time between the parties hereto in relation to the construction of this agreement or the due performance of any of the covenants hereof, the question shall be submitted to arbitrators."

In dismissing the preliminary objections, the Court referred to its opinion in the companion case of *Pittsburgh & Birmingham Traction Company v. United Traction Company and Philadelphia Company.* In that case the Court characterized the arbitration agreement now invoked as "one which sets up a method for submitting

disputes which have not yet occurred to arbitrators not yet named, but the method of naming of which has been outlined". It added: "The Court is of the opinion after careful consideration that had any dispute arisen which had been by agreement of the parties submitted to arbitration by persons named in the manner provided, then any award made by such arbitrators would have been binding. It is equally clear to the Court that the arbitration provisions of the Thirteenth Paragraph, relating as they do entirely to things "in futuro" is unenforcible and revocable at anytime."

Appellants in their brief do not challenge this statement for they say: "The question which we now raise is not whether the above agreement as to arbitration is revocable or irrevocable, or whether a court of equity will grant specific performance of an arbitration agreement; the question is whether a court of equity will grant relief to a party seeking its aid who has himself failed to comply with his solemn covenant to arbitrate."

By bringing this suit Monongahela did in fact revoke the arbitration agreement and this it had a right to do. By so doing it did not disentitle itself to go into a court of equity to seek the latter's aid in enforcing the clear provisions of the lease as to the lessee's duty to pay the taxes in default since 1938.

Philadelphia cannot invoke the arbitration clause Consolidated attempts to invoke. The only relief sought from Consolidated is the discovery of certain information. Plaintiffs' demand as to the unpaid taxes was that Philadelphia be required to pay taxes "imposed upon Monongahela or for which it would otherwise in anywise be liable or chargeable". Philadelphia, a surety, is attempting to require Monongahela, a creditor, to proceed against Consolidated, a principal debtor, in a particular manner as a condition to Monongahela's right to any remedy against Philadelphia. The latter cannot do this unless it complies with Section 1 of the Act of May 14, 1874, P. L. 157, 8 P.S., Sec. 21, which provides as follows:

"The surety or sureties in any instrument in writing for the forbearance or payment of money at any future time, shall not be discharged from their liability upon the same, by reason of notice from the surety or sureties, to the creditor or creditors, to collect the amount thereof from the principal in said instruments, unless such notice shall be in writing and signed by the party giving the same."

Whether Monongahela should first proceed by arbitration against Consolidated is a defense available only to the latter and not to Philadelphia, the surety. This rule of law as to a "personal privilege" which only the possessor of it can take advantage of has been applied in the following cases: *Kuns's Executor v. Young,* 34 Pa. 60, where the incapacity of the principal was due to infancy; *Wiggins' Appeal,* 100 Pa. 155, where the incapacity of the principal was due to coverture; *U. S. v. Mercantile Trust Company,* 213 Pa. 411, 62 A. 1062, where the statute of limitations had run against the debt for which the bond sued upon had been given as security; *Walton v. American Surety Company,* 264 Pa. 272, 107 A. 725, in which the defense to an action on a bond was that the bond was given to prevent the issuing of a warrant against the debtor named in the bond and that the bond was obtained by means of false statements and threats made by plaintiff's counsel to the obligor. It was held that "where it appears from the affidavit of defense that the surety company knew of the alleged threats, before it executed the bond, it cannot set up the defense of duress".

In conclusion: to revert to the basic issue in this case, it is widely recognized that there are "two categories" of tax covenants in leases. In the first are covenants of the lessee to pay taxes imposed on the *leased property,* or the *business* there carried on, or on *receipts* from the business there carried on. In the second category are covenants of the lessee to pay *all taxes* imposed on the lessor or for which the lessor would otherwise in

anywise be liable or chargeable on account of *its* earnings or profits. Under such covenants, it has been uniformly held in this state, that the covenant of the lessee extends to the payment of income taxes, imposed on the income of the lessor, either by the nation or by the state. Over a long period the Philadelphia Company has itself interpreted the covenant by which it is bound as guarantor as requiring it to pay all the taxes, including income taxes, imposed upon Monongahela Street Railway Company and also the interest on the latter's bonds.

This case has been skilfully and thoroughly argued by the able opposing counsel; the learned court below gave to the basic issue and every other issue raised painstaking consideration, and since the record is barren of substantial error all the assignments of error must be overruled.

The decree of the court below is affirmed at the cost of appellants.